

PAR: 2022R00371
JTM 06.24.22

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. |
| | * | |
| AYAZ QURESHI, | * | (Wire Fraud Conspiracy, 18 U.S.C. |
| | * | § 1349; Forfeiture, 18 U.S.C. § |
| Defendant. | * | 18 U.S.C. § 982(a)(2)(A); 28 U.S.C. |
| | * | § 2461(c)) |
| | * | |

**INFORMATION**
**COUNT ONE**
(Wire Fraud Conspiracy)

**Relevant Individuals, Entities, and Account(s)**

The United States Attorney for the District of Maryland charges that:

At all times material to the Information:

1. Defendant **AYAZ QURESHI ("QURESHI")** was a resident of Severna Park, Maryland.

2. On or about February 27, 2013, **QURESHI** incorporated a business with state of Maryland called Yazee, Inc. **QURESHI** was the President of Yazee, Inc.

3. Yazee, Inc. maintained an account at Wells Fargo Bank, N.A. ("Wells Fargo"), a financial institution insured by the Federal Deposit Insurance Corporation and doing business throughout the United States, with an account number ending in 9954 (the "9954 Account"). **QURESHI** and his wife S.N. were the sole signatories on this account.

4. Bank 1 was a federally insured financial institution headquartered in Fort Lee, New Jersey. Bank 1 was an approved United States Small Business Administration ("SBA") lender and participated as a lender in the Paycheck Protection Program ("PPP").

5. Co-conspirator A.S. was a resident of Baltimore, Maryland who ran a purported financial services business.

6.      Payroll Processor 1 is a payroll processing and technology company headquartered in Oklahoma City, Oklahoma doing business throughout the United States.

## The Paycheck Protection Program

7.      The SBA is an executive-branch agency of the United States government that provides support to entrepreneurs and small businesses. The mission of the SBA is to maintain and strengthen the nation's economy by supporting the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

8.      The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in and around March 2020, designed to provide emergency financial assistance to Americans suffering from the economic effects caused by the COVID-19 pandemic. Two sources of relief provided by the CARES Act were the authorization of forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program and the expansion of the Disaster Loan Program to include pandemic related economic injury through COVID-19 Economic Injury Disaster Loans ("EIDL").

9.      To obtain a PPP loan, a qualifying business had to submit a PPP loan application signed by an authorized representative of the business. The PPP loan application required the business, through its authorized representative, to acknowledge the program rules and to make affirmative certifications to be eligible for the PPP loan. For example, in the PPP loan application (SBA Form 2483), the business, through its authorized representative, had to state its average monthly payroll expenses and number of employees. In addition, as part of the PPP loan application process, businesses had to provide documentation showing their payroll expenses. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP.

10. Once a qualifying business completed a PPP application, a participating lender, or agent on behalf of the participating lender, processed the application. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which the SBA guaranteed. In the course of processing the PPP loan, the lender transmitted data from the loan application to the SBA, including information about the borrower, the total amount of the loan, and the identified number of employees.

11. Proceeds from a PPP loan were legally required to be used only for certain permissible business expenses, including payroll costs, mortgage interest, rent, and utilities. Under the applicable PPP rules and guidance, the interest and principal on the PPP loan was eligible for forgiveness, if the business spent the loan proceeds on permissible items within a designated period of time and used a certain portion of the loan toward payroll expenses.

## PPP Application

12. On or about March 14, 2021, A.S. submitted, or assisted with the submission of, a PPP loan application to Bank 1 for Yazee, Inc. with the knowledge and consent of **QURESHI**.

13. Prior to submission of that application, **QURESHI** provided A.S. certain documents to be included with the PPP loan application, including photographs of his Maryland driver's license, a voided check from the 9954 Account, and a bank statement dated February 29, 2020 for the 9954 Account.

14. The PPP loan application for Yazee, Inc. reported that Yazee, Inc. had 16 employees and an average monthly payroll of $100,289.00.

15. On or about March 21, 2021, the PPP loan application was manually or electronically signed with **QURESHI**'s name as the owner of Yazee, Inc.

16. In addition, the PPP application contained the initials of **QURESHI** to certify each of the following representations:

3

    a. Yazee, Inc. was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC;

    b. The funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments; and

    c. The information provided in the application and the information provided in all supporting documents and forms is true and accurate in all material respects.

17. The PPP loan application for Yazee, Inc. included a falsified Internal Revenue Service (IRS) Form 940—Employer's Annual Federal Unemployment Tax Return—for 2019, to substantiate the amount of wages paid to purported employees of Yazee, Inc. for the 2019 tax year. The falsified 2019 Form 940 indicated "Total payments to all employees" of $1,203,471.52.

18. In fact, during the 2019 tax year, Yazee, Inc. paid no wages to any employee.

19. Moreover, the IRS has searched its records for Yazee, Inc., and has no records of any filed tax records for any part of 2019 or 2020 for the business.

### PPP Loan Funding And Kickback Payments To A.S.

20. Based on the fraudulent and false representations and submissions made on behalf of **QURESHI** as the owner of Yazee, Inc., on or about March 22, 2021, the PPP loan funded, and approximately $250,723.00 was distributed by Bank 1 to the 9954 Account.

21. For his work on the PPP loan application for Yazee, Inc. A.S. expected to receive a kickback payment of approximately 30 percent of the funded loan amount ($75,000.00) from **QURESHI**.

22. After the PPP loan funded, **QURESHI** provided A.S. the following checks signed by **QURESHI**, which were drawn on the 9954 Account, and which reflected payment to A.S. for his work on the PPP loan application for Yazee, Inc.:

4

      a. Check #1019 in the amount of $15,000.00;

      b. Check # 2022 in the amount of $5,000.00;

      c. Check #2023 in the amount of $10,000.00;

      d. Check # 2024 in the amount of $10,000.00;

      e. Check #2025 in the amount of $10,000.00;

      f. Check #2026 in the amount of $10,000.00;

      g. Check #2027 in the amount of $10,000.00; and

      h. Check #2028 in the amount of $5,000.00.

23. At the time the **QURESHI** provided A.S. the checks referenced in paragraph 22, **QURESHI** left the payee name on each check blank.

24. Thereafter, A.S. and others known and unknown to the United States Attorney, wrote a payee name on each of the checks, each check was ultimately deposited, and each was ultimately drawn on the 9954 Account.

### Establishment of Payroll For Purported Employees Of Yazee, Inc.

25. On or about June 22, 2021, **QURESHI** signed an agreement with Payroll Processor 1 pursuant to which Payroll Processor 1 agreed to provide payroll processing services for Yazee, Inc. and its purported employees. The agreement authorized Payroll Processor 1 to make withdrawals from the 9954 Account for the purpose of making payments to purported employees of Yazee, Inc. Each of these individuals had been identified by **QURESHI** as employees of Yazee, Inc., but, in fact, were not employed by the business.

26. Beginning on or about July 2, 2021 and continuing through on or about December 15, 2021, Payroll Processor 1 made purported payroll payments from the 9954 Account via ACH debits to **QURESHI**, his wife, and his other associates that purported to be employees of Yazee, Inc.

5

27. In total, $144,647.21 in purported payroll payments were made to **QURESHI**, his wife, and other associates from the 9954 Account, all of which consisted of funds traceable to the PPP loan obtained by **QURESHI** and Yazee, Inc., his purported business.

28. Beginning in or around March 2021 and continuing through in or around December 2021, in the District of Maryland and elsewhere, the defendant,

**AYAZ QURESHI**,

knowingly and willfully, conspired and agreed with A.S. and others known and unknown to the United States Attorney to commit any offense under Chapter 63 of Title 18, United States Code, namely, to knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a financial institution, namely Bank 1, and to obtain and attempt to obtain money and property of Bank 1 by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing and attempting to execute the scheme to defraud, did knowingly and willfully transmit and cause to be transmitted by means of wire communications, in interstate and foreign commerce, writings, signs, signals, pictures, and sounds (the "scheme to defraud"), in violation of 18 U.S.C. § 1343.

**The Object of the Scheme to Defraud**

29. It was the object of the conspiracy and scheme to defraud for **QURESHI** to personally enrich himself by (1) fraudulently obtaining a PPP loan in the amount of more than $250,000.00 for his own personal use and benefit, and for the personal benefit and use of his associates; and (2) offering and paying kickbacks in return for the submission of the false and fraudulent PPP loan application.

**Manner and Means of the Scheme to Defraud**

30. It was part of the conspiracy and scheme to defraud that Defendant **QURESHI**, A.S., and others known and unknown to the United States Attorney, conspired to submit false

materials, including a false PPP loan application and a false 2019 IRS Form 940, to Bank 1 to obtain a PPP loan for Yazee, Inc.

31.  It was a further part of the conspiracy and scheme to defraud that A.S. and others known and unknown to the United States Attorney, fabricated a false IRS Form 940 to be submitted with the PPP loan application for Yazee, Inc.  The purpose of the false IRS Form 940 was to circumvent Bank 1's requirement that prospective borrowers submit documentation to support the payroll figures that served as the basis for the PPP loan amount.  The false IRS Form 940, which had never been filed with the IRS, was submitted in support of the PPP loan application for Yazee, Inc.

32.  It was a further part of the conspiracy and scheme to defraud that the fabricated IRS Form 940 reflected that Yazee, Inc. paid $1,203,471.52 in wages to all employees in 2019.  In fact, in 2019 and 2020, Yazee, Inc.: (1) did not file any 2019 Form 940 with the IRS; (2) pay unemployment tax to the IRS; or (3) withhold federal income tax for any employee.

33.  It was a further part of the conspiracy and scheme to defraud that based on the fraudulent and false representations and submissions made on behalf of **QURESHI** as the owner of Yazee, Inc., on or about March 22, 2021, the PPP loan funded, and approximately $250,723.00 was distributed by Bank 1 to the 9954 Account belonging to Yazee, Inc.

34.  It was a further part of the conspiracy and scheme to defraud that **QURESHI** paid A.S. a $75,000.00 kickback, reflecting approximately 30 percent of the PPP loan amount received by Yazee, Inc. in exchange for A.S.'s role in submitting the PPP loan application for the purported business.

35.  It was a further part of the conspiracy and scheme to defraud that **QURESHI** paid A.S. this kickback by providing him a total of eight checks (referenced in paragraph 22 above),

each of which was signed by **QURESHI** and had a dollar amount filled in, but that left the payee blank.

36. It was a further part of the conspiracy and scheme to defraud that A.S. and others unknown and unknown to the United States Attorney wrote a payee name on each of the checks, each check was deposited into accounts controlled by A.S., and each was ultimately drawn on the 9954 Account.

37. It was a further part of the conspiracy and scheme to defraud that after receiving the PPP loan for Yazee., Inc. **QURESHI**, with the assistance of A.S., established payroll processing services through Payroll Processor 1 for the purpose of making payments to purported employees of Yazee, Inc., including **QURESHI**, his wife, and other associates. The purpose of establishing payroll services for Yazee, Inc. after receipt of the PPP loan was to facilitate the creation of documentation that could be used to substantiate a request for the PPP loan to be forgiven, which it was.

38. It was further part of the conspiracy and scheme to defraud that **QURESHI** made no payments to Bank 1 in connection with PPP loan for Yazee, Inc.

39. It was a further part of the conspiracy and scheme to defraud that **QURESHI**, A.S., and others known and unknown to the United States Attorney, utilized interstate wires to submit, assist in the submission, and communicate with each other about the submission of a PPP loan application to Bank 1 and to establish payroll processing services from Payroll Processor 1 for Yazee, Inc.

18 U.S.C. § 1349

## FORFEITURE ALLEGATION

The United States Attorney for the District of Maryland further finds that:

1. Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. §§ 924(d), 981(a)(1)(C), and 982(a)(2)(A), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), as a result of the defendant's conviction under the offense in Count One of this Information.

### Wire Fraud Forfeiture

2. Pursuant to 18 U.S.C. § 982(a)(2)(A), the defendant's conviction under the offense in Count One of this Information, the defendant,

### AYAZ QURESHI

shall forfeit to the United States any property constituting, or derived from, proceeds obtained directly or indirectly, as the result of the scheme to defraud.

### Substitute Assets

5. If any of the property described above, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with, a third party;
   c. has been placed beyond the jurisdiction of the court;
   d. has been substantially diminished in value; or
   e. has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

18 U.S.C. § 924(d)
18 U.S.C. § 982(a)(2)(A)
28 U.S.C. § 2461(c)
Fed. R. Crim. P. 32.2(a)

| | |
|---|---|
| _6/27/22_<br>Date | *Erek L. Barron/par*<br>Erek L. Barron<br>United States Attorney |